## Stream Pollution from Mines

RUTTER, Deputy Attorney General, March 15, 1944.
—You have requested us to advise you concerning certain powers and duties of the Sanitary Water Board with relation to the prevention and control of stream pollution.

The Sanitary Water Board was created by section 202 of the Act of June 7, 1923, P. L. 498, as amended by the Act of April 13, 1927, P. L. 207, 71 PS §12,

known as The Administrative Code. The board was continued by section 202 of The Administrative Code of April 9, 1929, P. L. 177, as amended, 71 PS §62. It consists of the Secretary of Health as chairman, the Secretary of Forests and Waters, the Fish Commissioner, and three other members: section 439 of The Administrative Code of 1929, 71 PS §149. Certain powers and duties of the board are set forth in section 2110 of the same code, as amended by the Act of June 21, 1937, P. L. 1865, 71 PS §540. The Department of Health has the power and duty of acting as the enforcement agent for the Sanitary Water Board: section 2109 of The Administrative Code of 1929, 71 PS §539. The general statute relating to the preservation and improvement of the purity of the waters of the Commonwealth, and to the duties and powers of the Sanitary Water Board with relation thereto, is the Act of June 22, 1937, P. L. 1987, 35 PS §691.1 et seq.

Section 301 of the Act of June 22, 1937, P. L. 1987, supra, provides that no industrial wastes may be discharged into the waters of the Commonwealth except as provided in said act. Industrial wastes are defined by section 1 of said act as meaning any liquid, gaseous, or solid substance, not sewage, resulting from any manufacturing or industry. Section 310 of said act provides that the aforesaid prohibition ". . . shall not apply to acid mine drainage and silt from coal mines until such time as, in the opinion of the Sanitary Water Board, practical means for the removal of the polluting properties of such drainage shall become known".

You inform us that the polluting properties of coal mine drainage consist principally of acid content which is in solution, certain mineral salts also largely in solution, and coal mine waste solids which are relatively inert particles of coal and waste rock of varying sizes in suspension; that, although the acid and mineral salts in such drainage can be chemically neutralized by well-known methods, the board knows of no reasonable and practicable method of general applicability on a com-

mercial scale for such neutralization, and believes that
further study is necessary before the exemption
against the discharge of such acids and mineral salts
can be removed. You further state that the board is of
opinion that reasonable and practicable methods for the
elimination of the major portion of the solids, con-
sisting of coal and rock particles, are available, that
such solids should be removed prior to the discharge
of mining waste waters into the streams of the Com-
monwealth, and that such removal is one of degree
and that any cessation of the exemption from the pro-
hibition of the discharge of such mine solids should be
properly qualified so as to require their removal only
to the extent that reasonable and practicable methods
are available.

The board desires to know, therefore, whether it can
declare a limited suspension of the aforesaid exemption
of mine drainage from the prohibition against the dis-
charge of industrial wastes, into streams, and specify
the extent to which such removal of coal mine solids is
practicable.

We have no hesitation in concluding that the board
has such power and authority. To hold otherwise would
be to say that, because all mine pollution could not be
successfully eliminated at one fell stroke, it should all
be tolerated until that becomes possible. Even a casual
reading of the legislation relating to this subject mat-
ter could not result in such a strained construction. To
deny the board the power to do what it contemplates
would be to impute to the legislature a state of mind
which not only is not revealed in the pertinent legisla-
tion, but which the history and language of such legisla-
tion clearly indicate to be otherwise. The legislature
has long struggled with the problem of stream pollution
in its efforts to restore the streams of the Common-
wealth as nearly as practicable to their pristine con-
dition.

It seems that the pollution of streams by coal mine
solids arises not only from discharge directly from op-

erating collieries but also from erosion from existing culm and waste banks, and also from the operation of "washeries" which take coal deposits from stream beds, remove merchantable coal therefrom, and return the waste solids to the stream. You wish us to advise you whether the board is within its authority in determining that waste waters resulting from the processing of such deposits now in the streams of the Commonwealth constitute an industrial waste within the meaning of the Act of June 22, 1937, P. L. 1987, supra. We are of opinion that it is. It seems to us to make no difference where industrial waste waters or other polluting matter come from. The important thing is what is done with them. If they are discharged into the waters of the Commonwealth they constitute an illegal pollution thereof.

It further appears that coal breakers are in general of two types, that is, those operated by the producers of the coal as an apparent part of the entire mining operation, and those breakers which serve anyone delivering coal to them for processing but which are not directly connected with any mining operation as such. You wish us to advise you whether such nonproducing breakers are industrial establishments rather than "coal mines". The reason for this question seems to be because of the exemption from the prohibition of the act of acid mine drainage and silt "from coal mines", whereas industrial establishments generally are subject to the prohibition. It is quite clear to us that a nonproducing breaker such as you describe is an industrial establishment and not a coal mine. An independent breaker not an integrated part of a mining operation is, to our minds, just as much an industrial establishment as a jewelry manufactory which cuts and shapes diamonds which originally came from a diamond mine. To hold otherwise would be to carry the concept of processing to an unwarranted conclusion. We are of the opinion that nonproducing breakers are industrial establishments within the meaning of the act.